Henry S. Alper and Agnes V. Alper, et al. [1] v. Commissioner. Alper v. Commissioner
Docket Nos. 67873-67902.
United States Tax Court
T.C. Memo 1962-38; 1962 Tax Ct. Memo LEXIS 270; 21 T.C.M. (CCH) 185; T.C.M. (RIA) 62038; February 27, 1962
Mason G. Kassel, Esq., and Ira T. Wender, Esq., for the petitioner. Robert J. Fetterman, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: These proceedings involve the following deficiencies in income tax: Year
(Calendar
Docket No.
Petitioner
or Fiscal)
Deficiency
67873
Henry S. & Agnes V. Alper
1951
$ 40,724.20
1952
72,136.47
1953
67,826.14
1954
309,816.96
67874
Robert L. & Lenore S. Alper
1951
3,521.78
1952
6,765.48
1953
15,191.32
1954
40,527.12
67875
Philip J. & Eleanor B. Alper
1951
3,593.80
1952
6,879.48
1953
15,490.52
1954
39,948.96
67876
Joshua J. & Eunice S. Stone
1951
3,998.42
1952
7,143.41
1953
15,115.53
1954
39,320.79
67877
Morrie & Rae R. Mendelson
1951
8,329.52
1952
15,206.78
1953
36,146.56
1954
7,187.17
67878
Barton Building Company
7/31/55
3,953.40
67879
Bedford Building Company
10/31/54
6,041.73
67880
Bostwick Building Company
7/31/55
4,426.82
67881
Dover Building Company
4/30/55
4,790.62
67882
Fremont Building Company
9/30/54
$ 5,801.39
67883
Emerson Homes, Inc.
4/30/53
8,188.44
4/30/54
7,120.15
4/30/55
5,308.56
67884
Fairwood Building Company
6/30/53
6,702.31
6/30/54
6,814.51
6/30/55
4,796.75
67885
Gwen Building Company
7/31/54
6,127.25
7/31/55
5,385.62
67886
Jewel Homes, Inc.
7/31/53
8,105.05
7/31/54
6,665.63
7/31/55
4,819.64
67887
Jasper Building Company
1/31/55
5,500.00
67888
Ivory Homes, Inc.
7/31/53
8,147.54
7/31/54
6,724.48
7/31/55
4,887.14
67889
Marcy Building Company
3/31/54
5,264.52
3/31/55
5,436.41
67890
Melvin Building Company
7/31/54
5,637.38
7/31/55
5,372.60
67891
Mt. Vernon Homes, Inc.
4/30/53
8,194.99
4/30/54
7,475.19
4/30/55
5,370.07
67892
Newport Building Company
7/31/55
4,364.71
67893
Oporto Building Company
9/30/54
5,790.58
67894
Radford Building Company
1/31/55
5,373.14
67895
Richland Building Company
9/30/54
5,777.82
67896
Rickie Building Company
7/31/54
6,238.66
7/31/55
5,174.13
67897
Shari Building Company
1/31/53
7,427.53
1/31/54
7,791.38
1/31/55
5,379.24
67898
Sherbourne Building Company
12/31/52
7,028.02
12/31/53
8,229.00
12/31/54
5,359.07
67899
Sutton Building Company
4/30/55
4,406.75
67900
Terri Building Company
3/31/54
7,246.49
3/31/55
5,434.17
67901
Woodsfield Building Company
6/30/53
8,182.81
6/30/54
6,568.60
6/30/55
4,974.10
67902
Sunningdale Homes, Inc.
1/31/53
86,419.19
1/31/54
188,117.27
1/31/55
289,814.69
*273 The respondent made certain alternative determinations which involve all the petitioners. Also, there are some issues which relate to particular cases. Certain issues were conceded. The issues remaining for decision are: 1. Did the respondent err in disallowing the surtax exemptions and in some cases the minimum excess profits credits claimed on the returns of each of 24 of the corporations, that is, all the corporate petitioners except Sunningdale Homes, Inc., or in the alternative, did the respondent err in allocating all the income of these 24 corporate petitioners to Sunningdale, or again in the alternative, to Mendota Building Company, a partnership. 2. As a further alternative, whether the respondent erred in disallowing under authority of section 1551, Internal Revenue Code of 1954, the surtax exemptions claimed by three of the corporate petitioners, Barton, Bostwick, and Newport, for fiscal years ending in 1955. 3. What was the value of an interest in certain lots acquired by some of the individual petitioners in January 1954. 4. In the case of Henry and Agnes Alper, what was the fair market value in January 1951 of a one-half interest in an *274 option to buy certain land, and what is the correct allocation of the cost basis in certain lands acquired by Alper in 1953. 5. Whether gain reported by Morrie and Rae Mendelson in 1954 was properly reportable for that year, and whether Mendelson sustained a short-term capital loss on the sale of an interest in land. 6. Whether the notices of deficiency were timely with respect to the years 1951 and 1952 in the cases of Robert and Lenore Alper, Philip and Eleanor Alper, Joshua and Eunice Stone, and Morrie and Rae Mendelson. Some facts were stipulated. Findings of Fact The stipulated facts are so found. Petitioners Henry S. Alper and Agnes V. Alper are individuals, husband and wife, residing in Detroit, Michigan. Petitioners Robert L. Alper and Lenore S. Alper are individuals, husband and wife, residing in Detroit, Michigan. Their Federal income tax return for 1951 was filed on March 17, 1952, and the tax shown to be due thereon was paid on that date. Their return for 1952 was filed on March 17, 1953. These petitioners have not signed any agreement extending the period for the assessment of tax for the calendar years 1951 or 1952. Petitioners Philip J. Alper and Eleanor *275 B. Alper are individuals, husband and wife, residing in Detroit, Michigan. The Federal income tax return for 1951 was filed on or before March 18, 1952. Their return for 1952 was filed on March 16, 1953. These petitioners have not signed any agreement extending the period for the assessment of income tax for the calendar years 1951 or 1952. Petitioners Joshua J. Stone and Eunice S. Stone are individuals, husband and wife, residing in Huntington Woods, Michigan. Their Federal income tax return for 1951 was filed on March 18, 1952. Their return for 1952 was filed on March 18, 1953. These petitioners have not signed any agreement extending the period for the assessment of income tax for the calendar years 1951 or 1952. Petitioners Morrie Mendelson and Rae R. Mendelson are individuals, husband and wife, residing in Detroit, Michigan. Their Federal income tax return for 1951 was filed on March 19, 1952. Their return for 1952 was filed on March 17, 1953. These petitioners have not signed any agreement extending the period of assessment of income tax for the calendar years 1951 or 1952. The individual petitioners filed joint Federal income tax returns for each of the calendar years *276 1951 through 1954 on the cash basis with the collector or director of internal revenue at Detroit, Michigan. Robert and Philip are sons of Henry and Agnes Alper, and Mendelson is Henry Alper's son-in-law. Henry S. Alper, Morrie Mendelson, and Joshua J. Stone will be referred to by their last names. Robert L. Alper, Philip J. Alper and Agnes V. Alper will be referred by their first names. Corporate Federal income tax returns were filed for each of the 25 corporate petitioners for the taxable years involved with the collector or director of internal revenue at Detroit, Michigan. Each of the corporate petitioners' books and records were kept and returns filed upon an accrual basis. These corporations will hereinafter be referred to by the first name appearing in the title. Two corporations, Stout Home Builders, Inc., incorporated April 26, 1950, and Fargo Building Company, incorporated May 5, 1950, are involved in these proceedings but are not petitioners. These two corporations will likewise be referred to as Stout and Fargo, respectively. They were dissolved in 1954. Alper has been engaged in the building business for 20 years. From 1939 to 1949 he was in that business with *277 his brother. Alper desired to bring his sons into the business with him, engaging in the business of building tract homes. On April 1, 1950, Alper, Stone, Mendelson, Robert, Philip, and Agnes entered into a partnership agreement which, among other things, recited that Alper had been doing business under the name of Mendota Building Company since December 7, 1949; that he was desirous of entering into a partnership arrangement to continue the operation of the business with the other parties to the agreement; and that the parties to the agreement should share in the profits of the business in the following percentages: Percent
Alper
30
Agnes
25
Stone
9
Mendelson
18
Robert
9
Philip
9
Alper was the only partner who contributed capital to Mendota at the time of its formation and throughout the year 1950. The amount of that contribution was approximately $13,000. Other contributions to the capital accounts came from partnership profits. This partnership agreement was for one year. By new partnership agreements dated January 2, 1951, and January 2, 1953, respectively, the term of the partnership was extended incorporating the provisions of the original *278 agreement but providing for a division of profits as follows: First Ex-
Second Ex-
tension
tension
1951-1952
1953
Alper
25
23 8/10
Agnes
25
25
Stone
10 2/3
10 4/10
Mendelson
18
20
Robert
10 2/3
10 4/10
Philip
10 2/3
10 4/10
At the end of 1953 Mendelson withdrew as a partner. Alper, Agnes, Robert, Philip, and Stone executed a new partnership agreement dated January 1, 1954, which included the terms of the previous agreements but provided for a division of profits as follows: Percent
Alper
35
Agnes
25
Stone
13 1/3
Robert
13 1/3
Philip
13 1/3
In the period from April 1950 through August 1954 the corporate petitioners and Stout and Fargo were incorporated. Mendelson was a stockholder in those formed before September 1953 but had no interest in the 11 formed thereafter. Alper, Stone, and Agnes had stock in all the corporations. Robert and Philip each had stock in all but one. The members of the partnership held the stock in most cases in substantially the same proportions as their interest in the partnership at the time of incorporation. Each corporation had one class of stock with a par *279 value of $10 per share. The articles of incorporation were similar except that Shari and Woodsfield were authorized to build and rent apartments as well as build houses for sale. Alper was president and Stone was secretary of each corporation. They were the officers who usually exercised authority to act for the corporations. In the period from 1950 to the middle of 1955 the partners through their organization built 968 homes for sale. The sales approximated $11,800,000, and net profits of some $1,900,000 were realized. Some $400,000 of profits realized on the sale of 153 houses was reported on the returns of the partnership. Approximately $1,500,000 of profits realized on the sale of 815 homes was reported on the returns of the corporations. The total corporate surtax and excess profits tax paid on the $1,500,000 of profits so reported was $364.21. The partnership returns were filed on an accrual basis and covered calendar years. The gross sales and net income reported on the partnership returns (nearest $1,000) was: Year
Gross Sales
Net Income
1950
$487,000
$ 91,000
1951
561,000
107,000
1952
538,000
109,000
1953
664,000
112,000
1954
73,000
24,000
*280 The partners, through the partnership and the corporate petitioners, were engaged in the speculative home building business, principally in Wayne County, Michigan. This business consists of building a number of houses in a subdivision for sale to buyers on low down payments with the aid of Federally insured mortgages. In most projects Alper acquired acreage, caused land to be platted, and the plat filed as a subdivision with the appropriate local authorities. The land would then be improved and made ready for building by the installation of necessary utilities. Plans would be drawn up for houses and application made to the Veterans Administration (VA) or the Federal Housing Administration (FHA) for a complete subdivision showing the lots on which houses were to be built and the types of houses to be built. Applications were usually made by Mendota. From the VA a certificate of reasonable value (CRV) would be obtained. This is a determination by the VA of the value of the house and lot and sets the maximum price at which the house can be sold to a veteran. Upon this valuation the VA sets the maximum mortgage it will insure on the property. Mendota frequently obtained conditional *281 commitments from the FHA. This is an agreement that it will insure a mortgage of a fixed amount on a particular house if the house is built in accordance with the plan and passes FHA inspection and if an acceptable buyer is found. Mendota usually applied for building permits from the local authorities. Model homes would be built in the subdivision and sales made through brokers. When sufficient offers to purchase were received, construction of the remaining houses would be commenced. Actual construction work was done by subcontractors. Mendelson was superintendent of construction until he withdrew from the partnership, and Robert and Philip Alper were superintendents thereafter. The prices for work performed by the subcontractors were negotiated on the basis of performing the work on all the homes in the subdivision. Materials were ordered as needed on the jobs by the supervisors who were employees of Mendota. Some materials were purchased in volume by Mendota to obtain quantity discounts. Alper decided which corporations would be allotted sites in the subdivision and how many lots each would have. Bank accounts were opened for each corporation, and Alper loaned money to each *282 corporation to enable it to issue checks in payment of the costs of construction or materials. Title to the lots was transferred from Alper to the corporation, usually at Alper's cost for the land. In some instances Alper transferred title after construction was started or after an offer of purchase had been received from a buyer. The accounting was handled by Stone. When bills were received for materials or from the contractors for services, he posted the costs to the individual houses and charged them to the corporation involved. Stone kept books for each corporation showing the costs of the houses built on the lots allotted to that corporation and the proceeds of sales of such houses. Alper took notes from the corporations for funds he advanced. When sales were made and profits shown on the books of the corporations, Alper took the money in repayment of his loans and took the profits, giving his notes to the corporation. Alper then used the funds thus acquired to loan to new corporations for financing new construction. Some of the corporations borrowed from lending institutions. Mendota charged a fee to each corporation of from $150 to $400 for services performed in keeping *283 books and records, applying for permits or loans, purchasing stock items for building, servicing buyers' complaints, and for superintending construction. Sales were made through independent brokers who charged a fee for each house sold. Some of the houses were advertised under the name "Sunningdale Homes." Offers to purchase and checks for deposits were sometimes addressed to the broker, sometimes to "Sunningdale Homes" and sometimes to the corporation having title to the site. In all cases the funds, less commission, were paid over to the corporation involved. A single office was maintained for Mendota and the records of all the corporations were handled there. No corporation's name appeared on the premises. The name "Sunningdale Homes" appeared there. This was used as a trade name and not as a reference to Sunningdale Homes, Inc., one of the corporations. The corporations had no construction equipment and no employees except their officers. Mendota had no construction equipment and few employees. It owned a small amount of office equipment. Its annual payroll ranged from $2,800 to $28,000. Alper advanced money for financing the building operations until the profits from sales *284 were sufficient to repay his advances. In 1950 he supplied money to Sunningdale, Stout, and Fargo for construction of houses on the sites allotted to them. His advances exceeded $190,000 in August 1950. After the corporations received money from the sales of houses, Alper took the proceeds to repay his advances and borrowed the profits to be loaned to other corporations for building in other subdivisions. In 1950 and 1951 Alper's loans to corporations exceeded his borrowings from them. After 1951 his borrowings sometimes exceeded his loans and sometimes did not. After June 1954 his borrowings always exceeded his loans and reached $275,000 by December 1954. The corporations formed by the partners, the month in which the articles of incorporation were filed, and the end of the fiscal year of each corporation were: Month Arti-
End of Fis-
Name of Corporation
cles Filed
cal Year
Sunningdale
Apr. 1950
Jan. 31
Stout
Apr. 1950
Nov. 30
Fargo
May 1950
Oct. 30
Fairwood
Jan. 1951
June 30
Sherbourne
Jan. 1951
Dec. 31
Woodsfield
Feb. 1951
June 30
Shari
Feb. 1951
Jan. 31
Mt. Vernon
May 1951
Apr. 30
Emerson
May 1951
Apr. 30
Ivory
Aug. 1952
July 31
Jewel
Aug. 1952
July 31
Terri
Apr. 1953
Mar. 31
Marcy
Apr. 1953
Mar. 31
Gwen
Aug. 1953
July 31
Melvin
Aug. 1953
July 31
Rickie
Aug. 1953
July 31
Fremont
Oct. 1953
Sept. 30
Oporto
Oct. 1953
Sept. 30
Richland
Oct. 1953
Sept. 30
Bedford
Nov. 1953
Oct. 31
Jasper
Feb. 1954
Jan. 31
Radford
Feb. 1954
Jan. 31
Dover
May 1954
Apr. 30
Sutton
May 1954
Apr. 30
Barton
Aug. 1954
July 31
Bostwick
Aug. 1954
July 31
Newport
Aug. 1954
July 31
*285 The subdivisions in which the 968 homes were built and the approximate number of homes built in each subdivision were: Number of
Homes
Cherry Hill Manor Tract
Cherry Hill Manor
141
Cherry Hill Manor No. 2
29
Cherry Hill Manor No. 3
74
Cherry Hill Manor No. 4
90
Thomas Elliot
157
Thomas Elliot No. 2
23
Greenette
32
New Detroit
12
Bel Aire Gardens
166
Devonshire Park
48
Riverview Gardens
61
Holtzman-Silverman No. 5
82
Madeline B.
10
Alper-Green
43
Total
968
All of the subdivisions were located in Wayne County, Michigan, and within the metropolitan Detroit area. The Cherry Hill Manor subdivisions, in which 334 homes were built, were contiguous plats located in a 160-acre tract of land in Inkster, a suburb of Detroit. Thomas Elliot, Thomas Elliot No. 2, Greenette, New Detroit, Bel Aire Gardens and Devonshire Park subdivisions, in which 438 homes were built, were in Livonia, a suburb of Detroit. They were adjacent and were located in an area less than two miles long and one-half mile wide. The Riverview Gardens and Holtzman-Silverman No. 5 subdivisions, in which 143 homes were built, were contiguous and located in Riverview, *286 a suburb of Detroit. Madeline B. subdivision was in Allen Park, a suburb of Detroit, and Alper-Green subdivision was in Detroit. Livonia was some 35 miles from Riverview Gardens and ten or twelve miles from Alper-Green. Cherry Hill was some seven miles from Livonia and 20 miles from Madeline B. The approximate periods covered by the building activities in each subdivision from the first excavations to the last substantial sales are shown below. This does not include purchasing the raw acreage or subdividing or improving with utilities or paying. Month
Month
Subdivision
Started
Closed
Cherry Hill Manor
July 1950
Oct. 1951
Cherry Hill Manor #2
Sept. 1951
Apr. 1952
Cherry Hill Manor #3
Sept. 1951
Sept. 1952
Cherry Hill Manor #4
June 1952
June 1953
Thomas Elliot
May 1952
Mar. 1954
Thomas Elliot #2
Mar. 1953
May 1954
Greenette
Mar. 1953
Jan. 1954
New Detroit
Oct. 1953
Apr. 1954
Bel Aire Gardens
Oct. 1953
Nov. 1954
Riverview Gardens
May 1953
May 1954
Madeline B.
May 1953
Apr. 1954
Alper-Green
May 1954
Late 1955
Holtzman-Silverman #5
July 1954
June 1955
Devonshire Park
Nov. 1954
Late 1955
Sunningdale was *287 the first of the corporate petitioners to be formed. It was used in the building of 34 homes in the Cherry Hill Manor subdivision. It was incorporated on April 26, 1950. Its first fiscal year was terminated on January 31, 1951. It reported net income from the sale of 17 homes in the amount of $22,565.89. Sales of the other 17 homes were completed early in 1951. The corporation was not active thereafter until 1952. The sale of the second 17 homes resulted in income of $24,834.48 reported on the return for the fiscal year ended in 1952. Sunningdale was used in Cherry Hill Manor No. 3 and No. 4 in its fiscal years ending in 1953 and 1954 and in Bel Aire Gardens subdivision in its fiscal year ending in 1955. Stout and Fargo were organized in 1950 and were used in that year in a subdivision not here involved. They were used in 1951 and 1952 in Cherry Hill Manor No. 2 and in Thomas Elliot subdivisions. Fargo was used in Cherry Hill No. 3. They were dissolved in May 1954. The partners formed six corporations in 1951: Fairwood, Sherbourne, Woodsfield, Shari, Emerson, and Mt. Vernon. Fairwood was used in Cherry Hill Manor, Thomas Elliot, Greenette, and Bel Aire Gardens subdivisions. Sherbourne *288 was used in Cherry Hill Manor, Cherry Hill No. 3 and No. 4, and in Riverview Gardens. Woodsfield was used in Cherry Hill Manor, Thomas Elliot, Greenette, and Bel Aire Gardens. Shari was used in Cherry Hill Manor, Cherry Hill No. 3 and No. 4, Thomas Elliot, and New Detroit. Emerson was used in Cherry Hill No. 3 and No. 4, Thomas Elliot No. 2, Bel Aire Gardens and Devonshire Park. Mt. Vernon was not used in its first year and later was used in Cherry Hill No. 4, Thomas Elliot No. 2, and Bel Aire Gardens. Three of these corporations, Sherbourne Shari, and Emerson, reported net income between $21,000 and $25,000 in their first fiscal year. They were inactive during part of the year. Two corporations, Ivory and Jewel, were formed in 1952. Both were used in Thomas Elliot, Riverview Gardens, and Holtzman-Silverman subdivisions. In 1953, five corporations were formed before October: Terri, Marcy, Gwen, Melvin, and Rickie. Terri was used in Riverview Gardens, Bel Aire Gardens and Devonshire Park. Marcy was used in Greenette, Madeline B., Bel Aire Gardens, and Devonshire Park. Gwen, Melvin, and Rickie were all used in Thomas Elliot and Holtzman-Silverman subdivisions. In October and November *289 1953, four corporations were formed in which Mendelson was not a stockholder. These were Fremont, Oporto, Richland, and Bedford. These were all used in Bel Aire Gardens and in Alper-Green subdivisions. In 1954 seven corporations were formed by the remaining partners: Jasper, Radford, Dover, Sutton, Barton, Bostwick, and Newport. Jasper was used in Bel Aire Gardens, Radford in Bel Aire Gardens, and Devonshire Park. Sutton was used in Alper-Green subdivision. Dover, Barton, Bostwick, and Newport were used in Holtzman-Silverman subdivision. The particular subdivision, the number of houses built in each subdivision, the entity reporting, for Federal income tax purposes, the sales of the houses built, and the period in which the sales were reported, are contained in the following table: Number of Houses
Sales
Subdivision
Constructed
Reported by
Number
Year
Cherry Hill Manor
141
Mendota
51
1951
Sunningdale
17
F/ 1951
Sunningdale
17
F/ 1952
Sherbourne
14
1951
Fairwood
2
F/ 1951
Fairwood
12
F/ 1952
Woodsfield
4
F/ 1951
Woodsfield
14
F/ 1952
Shari
10
F/ 1952
Cherry Hill Manor No. 2
29
Fargo
13
F/ 1952
Stout
16
F/ 1952
Cherry Hill Manor No. 3
74
Mendota
37
1952
Sherbourne
11
1952
Fargo
2
F/ 1952
Fargo
1
F/ 1953
Emerson
13
F/ 1952
Emerson
1
F/ 1953
Sunningdale
6
F/ 1953
Shari
3
F/ 1953
Cherry Hill Manor No. 4
90
Mendota
7
1952
Mendota
9
1953
Sherbourne
13
1953
Emerson
13
F/ 1953
Mt. Vernon
15
F/ 1953
Sunningdale
2
F/ 1953
Sunningdale
16
F/ 1954
Shari
15
F/ 1954
Thomas Elliot
157
Mendota
36
1953
Fairwood
10
F/ 1953
Jewel
14
F/ 1953
Ivory
14
F/ 1953
Fargo
14
F/ 1953
Stout
14
F/ 1953
Melvin
9
F/ 1954
Rickie
10
F/ 1954
Gwen
10
F/ 1954
Woodsfield
14
F/ 1953
Woodsfield
2
F/ 1954
Shari
9
F/ 1953
Shari
1
F/ 1954
Thomas Elliot No. 2
23
Emerson
11
F/ 1954
Mt. Vernon
11
F/ 1954
Mt. Vernon
1
F/ 1955
Greenette
32
Marcy
5
F/ 1954
Woodsfield
14
F/ 1954
Fairwood
13
F/ 1954
New Detroit
12
Shari
12
F/ 1955
Bel Aire Gardens
166
Mendota
6
1954
Oporto
15
F/ 1954
Fremont
16
F/ 1954
Richland
16
F/ 1954
Bedford
10
F/ 1954
Sunningdale
15
F/ 1955
Jasper
11
F/ 1955
Radford
10
F/ 1955
Terri
14
F/ 1955
Marcy
9
F/ 1955
Mt. Vernon
14
F/ 1955
Emerson
10
F/ 1955
Fairwood
10
F/ 1955
Woodsfield
10
F/ 1955
Devonshire Park
48
Mendota
7
1955
Radford
8
F/ 1956
Terri
11
F/ 1956
Marcy
11
F/ 1956
Emerson
11
F/ 1956
Riverview Gardens
61
Sherbourne
12
1954
Terri
16
F/ 1954
Ivory
16
F/ 1954
Jewel
17
F/ 1954
Holtzman-Silverman No. 5
82
Dover
10
F/ 1955
Gwen
10
F/ 1955
Newport
8
F/ 1955
Barton
8
F/ 1955
Jewel
9
F/ 1955
Rickie
9
F/ 1955
Ivory
9
F/ 1955
Melvin
11
F/ 1955
Bostwick
8
F/ 1955
Madeline B.
10
Marcy
6
F/ 1954
Marcy
4
F/ 1955
Alper-Green
43
Sutton
8
F/ 1955
Richland
9
F/ 1955
Fremont
8
F/ 1955
Oporto
9
F/ 1955
Bedford
9
F/ 1955
*290 In the Holtzman-Silverman No. 5 subdivision there were 82 building sites. These were originally allotted in early 1954 among six corporations: Gwen (14), Melvin (14), Rickie (14), Ivory (13), Jewel (13), and Dover (14). Dover was newly organized in May 1954. Construction was started and some payments made for construction costs were charged to these corporations between April 22 and July 30, 1954. Three new corporations, Barton, Bostwick, and Newport, were organized in August 1954. The building sites were reallocated as follows: Gwen (10), Dover (10), Melvin (11), Rickie (9), Ivory (9), Jewel (9), Barton (8), Bostwick (8), and Newport (8). Mendota reimbursed the original six corporations for the construction costs on certain of the houses and these costs were reallocated to the new corporations to which the houses were allotted. The nine corporations reported the sales of the 82 houses in their returns for the fiscal years ending in 1955. The profits were reported on the corporations' returns for the fiscal year 1955 in the following amounts: Net Profits
Reported
Gwen
$ 24,480.09
Dover
21,775.54
Melvin
24,420.91
Rickie
23,518.76
Ivory
22,214.29
Jewel
21,907.46
Barton
17,969.99
Bostwick
20,121.90
Newport
19,839.57
Total
$196,248.51
*291 Melvin was the only one of the nine corporations which reported net income before salaries of over $25,000. It had net income before salaries of $27,420.91. Wages of $3,000 were paid to employees of Mendota so that Melvin's net income was below $25,000. No corporate surtax was paid by any of the nine corporations. The following table shows the net income before salaries of officers, the amounts paid as salaries of officers and the net income after officers' salaries reported on the returns of each corporation. Net Income
Year
Before
Officers'
Net Income
Corporation
Ending
Officers' Salaries
Salaries
Reported
Sunningdale
1/31/51
$22,565.89
$22,565.89
1/31/52
24,834.48
24,834.48
1/31/53
19,208.45
19,208.45
1/31/54
34,542.87
$10,000
24,542.87
1/31/55
24,070.33
24,070.33
Stout Home Builders
11/30/50
23,837.75
23,837.75
11/30/51
24,296.03
24,296.03
11/30/52
32,106.48
8,000
24,106.48
11/30/53
27,318.79
3,500
23,818.79
Period ending
5/31/54
(Corporation dissolved)
(185.25)
Fargo
10/31/50
24,059.91
24,059.91
10/31/51
22,687.87
22,687.87
10/31/52
31,737.26
7,000
24,737.26
10/31/53
30,837.58
7,000
23,837.58
Period ending
5/31/54
(Corporation dissolved)
(170.75)
Fairwood
6/30/51
3,722.94
3,722.94
6/30/52
24,852.02
24,852.02
6/30/53
20,310.04
20,310.04
6/30/54
24,951.81
1,500
23,451.81
6/30/55
21,803.39
21,803.39
Sherbourne
12/31/51
24,193.87
24,193.87
12/31/52
23,426.73
23,426.73
12/31/53
25,110.54
25,110.54
12/31/54
24,359.40
24,359.40
Woodsfield
6/30/51
8,200.73
8,200.73
6/30/52
28,681.23
4,000
24,681.23
6/30/53
29,416.30
4,000
25,416.30
6/30/54
32,605.50
10,000
22,605.50
6/30/55
22,609.56
22,609.56
Shari
1/31/52
21,320.52
21,320.52
1/31/53
24,703.21
24,703.21
1/31/54
37,298.16
13,000
24,298.16
1/31/55
24,451.09
24,451.09
Mt. Vernon
4/30/52
Inactive for entire first year
4/30/53
24,833.30
24,833.30
4/30/54
27,808.41
4,000
23,808.41
4/30/55
30,409.43
6,000
24,409.43
Emerson
4/30/52
23,507.37
23,507.37
4/30/53
29,225.81
4,500
24,755.81
4/30/54
27,177.61
4,500
22,677.61
4/30/55
28,629.84
4,500
24,129.84
Ivory
7/31/53
28,362.60
4,000
24,362.60
7/31/54
28,129.32
4,000
24,129.32
7/31/55
22,214.29
22,214.29
Jewel
7/31/53
28,234.55
4,000
24,234.55
7/31/54
31,918.17
8,000
23,918.17
7/31/55
21,907.46
21,907.46
Terri
3/31/54
29,680.78
5,000
24,680.78
3/31/55
29,700.77
5,000
24,700.77
Marcy
3/31/54
$17,277.99
$17,277.99
3/31/55
32,210.96
$7,500
24,710.96
Gwen
7/31/54
21,863.60
21,863.60
7/31/55
24,480.09
24,480.09
Melvin
7/31/54
20,098.64
20,098.64
7/31/55
24,420.91
24,420.91
Rickie
7/31/54
22,265.03
22,265.03
7/31/55
23,518.76
23,518.76
Fremont
9/30/54
27,160.81
3,500
23,660.81
Oporto
9/30/54
23,603.27
23,603.27
Richland
9/30/54
30,049.38
6,500
23,549.38
Bedford
10/31/54
26,760.41
2,000
24,760.41
Jasper
1/31/55
31,348.91
6,000
25,348.91
Radford
1/31/55
29,423.36
5,000
24,423.36
Dover
4/30/55
21,775.54
21,775.54
Sutton
4/30/55
20,030.70
20,030.70
Barton
7/31/55
17,969.99
17,969.99
Bostwick
7/31/55
20,121.90
20,121.90
Newport
7/31/55
19,839.57
19,839.57
*292 The corporate officers to whom the salaries were paid,and the years and amounts paid by the various corporationswere as follows: Corporation
Year Ending
Alper
Robert
Philip
Mendelson
Stone
Sunningdale
1/31/54
$10,000
Stout
11/30/52
$2,000
$4,500
$1,500
11/30/53
2,000
1,500
Fargo
10/31/52
3,000
$2,500
1,500
10/31/53
3,000
2,500
1,500
Fairwood
6/30/54
1,500
Woodsfield
6/30/52
2,500
1,500
6/30/53
2,500
1,500
6/30/54
2,000
4,500
3,500
Shari
1/31/54
9,000
4,000
Mt. Vernon
4/30/54
4,000
4/30/55
1,500
4,500
Emerson
4/30/53
4,500
4/30/54
4,500
4/30/55
4,500
Ivory
7/31/53
3,000
1,000
7/31/54
2,000
1,500
500
Jewel
7/31/53
2,000
2,000
7/31/54
4,000
2,000
2,000
Terri
3/31/54
5,000
3/31/55
5,000
Marcy
3/31/55
6,000
1,500
Fremont
9/30/54
3,500
Richland
9/30/54
3,000
3,500
Bedford
10/31/54
2,000
Jasper
1/31/55
6,000
Radford
1/31/55
5,000
The payments of salaries to officers were made from the income of the corporations *293 which made the most money and were intended to reduce the net income to an amount less than $25,000. In most instances the checks were endorsed over to Mendota and the amounts were credited to the individual's capital account in the partnership. Some of the corporations reported the payment of wages as deductible expenses. The following corporations showed payment of wages as follows for the fiscal year stated: Fiscal Year
Amount
Corporation
Ended
of Wages
Mt. Vernon
4/30/55
$4,000
Melvin
7/31/55
3,000
Fremont
9/30/54
2,250
Oporto
9/30/54
4,000
Richland
9/30/54
3,500
Jasper
1/31/55
450
These wages were paid to employees of Mendota. Alper, Mendelson, Stone, Agnes, Philip, and Robert acquired control of the corporate petitioners, with the exception of Sunningdale, for the principal purpose of avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which the acquiring persons would not otherwise enjoy. Facts Regarding Valuation of Land in the Cherry Hill Manor Tract On November 23, 1949, Alper, individually, agreed to purchase 160 acres of land. Alper acted *294 in his own behalf and in behalf of a separate group of builders known as the "Holtzman group," with the understanding that he would have an undivided one-half interest in the land to be purchased. Among other terms, the agreement provided that Alper would complete the purchase of 40 acres of the tract within 60 days at a price of $1,050 per acre, with an option to purchase the balance of 120 acres at the same unit price per acre on or before December 30, 1950. A total of $10,000 was paid for the option rights, of which amount Alper paid $5,000 for his interest. The entire transaction was conditioned upon Alper's success in obtaining approval of the municipality for improving the land and in obtaining a commitment from the FHA to insure mortgages on homes to be built on the land. By February 7, 1950, Alper and the Holtzman group completed the purchase of the initial 40 acres and also of 10 contiguous acres. Shortly thereafter, they began to develop the 50 acres acquired for use as building sites under the designation of Cherry Hill Manor subdivision. At the same time, they planned the development of the remaining 110 acres which was later designated as Cherry Hill Manor No. 2, No. *295 3, and No. 4. A small amount of the acreage was sold to a school and churches. On April 28, 1950, Alper formed a corporation, Cherry Hill Manor, Inc. He was the sole stockholder and paid in a total of $1,000 for his stock. He transferred his share of the building sites in the 50 acres and his one-half interest in the option for the remaining 110 acres to this corporation. The undivided one-half interest in the option for the 110 acres was carried on the books of Cherry Hill Manor, Inc., at a value of $5,000. Alper dissolved Cherry Hill Manor, Inc., on January 31, 1951. In his 1951 return, Alper claimed a long-term capital gain of $114,173.93 on the redemption of stock in Cherry Hill Manor, Inc. This was computed by subtracting the $1,000 he paid for the stock from the claimed value of the assets he received upon the liquidation. The values reflected by the books of Cherry Hill Manor, Inc., and the values claimed by Alper are as follows: Carried
Alper's
Assets
on Books
Valuation
Cash
$ 5,799.37
$ 5,799.37
67 building sites in Cherry Hill Manor subdivision
60,972.41
80,400.00
1/2 interest in the option to acquire 110 acres
5,000.00
84,618.05
Total Assets
$71,771.78
$170,817.42
Liabilities
Accounts Payable
2,643.49
2,643.49
Notes Payable - Alper
54,000.00
54,000.00
Total Liabilities
$56,643.49
$ 56,643.49
Assets minus Liabilities
15,128.29
114,173.93
*296 Respondent accepted Alper's valuation of $80,400 for the 67 building sites in Cherry Hill Manor subdivision. Alper sold the 67 sites at the increased basis to the various corporations involved or to Mendota. Respondent accepted Alper's valuation of the option for approximately 32 acres of the 110 acres which was subsequently sold to a school and churches and that part which was used as commercial property. The respondent did not accept Alper's valuation of the option for the remaining 77.985 acres which were later developed for building sites. Alper computed the basis of this land by assigning a value of $1,450 per acre to the option and adding that to the cost of $1,050 per acre, arriving at a total basis of $2,500 per acre. Respondent determined that $50 per acre was the value of the option and added this to the $1,050 per acre cost, arriving at a total basis of $1,100 per acre. The respondent's adjustment in this respect reduced Alper's claimed value of the option from $84,618.05 to $30,028.55 and, accordingly, reduced his capital gain on the liquidation of Cherry Hill Manor, Inc., by $54,589.50. On January 15, 1951, a 40-acre tract of land adjacent to the Cherry Hill Manor *297 tract was sold at a price of $1,000 per acre. On February 15, 1951, a 30-acre tract of land also adjacent to the Cherry Hill Manor tract was sold for $1,100 per acre. Both of these tracts of land were in the same section in which the Cherry Hill Manor Tract was located. Alper ultimately received 217 building sites as his share of the approximately 78 acres when purchase was completed. The effect of respondent's determination was to reduce Alper's basis in each of these 217 building sites which he subsequently developed and sold to the various corporations or to Mendota, in 1951, 1952, and 1953. The basis of each building site was reduced by $251.56. The transfer of the building sites to the various corporations or to Mendota was for a price computed on the basis of Alper's valuation. The respondent determined that Alper realized ordinary income of $251.56 on the transfer of each of the building sites. The number of sites sold was 75 in 1951, 81 in 1952, and 61 in 1953. The fair market value of the 77.985 acres was $1,900 per acre on January 31, 1951. Facts Regarding the Value of Interest in Lots 700 and 701 in 1954 By September 1952, Alper and the group he represented had *298 completed the purchase of the land under the option. Approximately 14 acres located on the corner of the main roads, Cherry Hill Road and Inkster Road, were designated at lots 700 and 701 and reserved for development as a shopping center. The last of the several hundred houses built in the Cherry Hill Manor tract were under construction and being sold by the middle of 1953. On June 1, 1953, Alper transferred his undivided one-half interest in lot 700 to Fargo and his undivided one-half interest in lot 701 to Stout. Alper was paid $3,039.75 by Fargo for this interest and $15,296.25 by Stout. This was the basis claimed by Alper and the other stockholders upon the liquidation of Cherry Hill Manor, Inc. In August 1953, the stockholders of Stout and Fargo gave an option to C. William Sucher to purchase their stock in the two corporations. The option agreement provided, in effect, for the sale of the undivided one-half interest in lots 700 and 701 for $134,500. The sales price of lot 700 was $28,500. The sales price of lot 701 was $106,000. Louis H. Schostack represented Sucher in negotiating with Alper for the option and the price of the land. Schostack also obtained an option from the *299 holders of the other undivided one-half interest. The purpose of Sucher was to develop a shopping center on the land. Although Schostack had contacted prospective tenants of the shopping center prior to obtaining the options, he was not able to obtain final commitments from such tenants. The options were not renewed and expired on December 13, 1953. On January 12, 1954, the respective one-half interests of Fargo and Stout were distributed to the stockholders in partial liquidation of the corporations. The values placed upon the undivided one-half interests in lots 700 and 701 were $3,093.75 and $15,296.25, respectively, the same amounts at which the lots had been transferred to Fargo and Stout. Mendelson's interest in the lots was quitclaimed to Alper. Alper paid Mendelson 18 percent of $18,390 for Mendelson's interest. After the options on lots 700 and 701 expired at the end of 1953, Schostack interested another party, Milton Ratner, in development of the shopping center. On April 4, 1954, Schostack obtained an option from Alper and his associates to purchase the undivided one-half interests in lots 700 and 701 for $132,500. The option was to expire on July 5, 1954. Schostack *300 paid $5,000 for this option. He also acquired an option on the other one-half interests in the two lots. Several extensions of the options were granted but the property was never purchased. On December 15, 1954, Schostack released all of the optionors, and on this same date, Alper purchased the other undivided one-half interest in lots 700 and 701 for a total consideration of $105,000. On January 12, 1954, the fair market value of the undivided one-half interests in lots 700 and 701 distributed to the stockholders of Stout and Fargo was $40,500. Facts Regarding the Middlebelt Livonia Land Valuation On August 29, 1952, Alper and Abe Green, another builder, obtained an option to acquire the stock of a corporation then owning approximately 200 acres of undeveloped land in Livonia, a suburb adjacent to Detroit. In January 1953, Alper and Green exercised the option and acquired the stock. That same month they distributed 80 acres of the 200 to themselves jointly. The name of the corporation was changed to Middlebelt Livonia Land Company. On July 29, 1953, the corporation was dissolved and the balance of the land, approximately 120 acres, and the other assets of the corporation, *301 were distributed to Alper and Green jointly. Immediately upon liquidation of the corporation, Alper and Green each owned an undivided one-half interest in the 200 acres. The cost of the undivided one-half interest which Alper had was stipulated to be $222,547.45, computed as follows: Cost of stock in the Middlebelt Livonia Land Co.
$239,853.85
Add liabilities assumed: Mortgage payable
$91,937.50
Accrued expenses
3,603.75
95,514.25
Total
$335,395.10
Less assets received: Cash
$94,368.47
Land contract receivable
15,000.00
Accrued income and prepaid expenses
3,479.18
112,847.65
Cost Basis of Land
$222,547.45
In his 1953 return, Alper reported a long-term capital gain of $279,952.55 on the redemption of his stock in the Middlebelt Livonia Land Company. The gain thus reported was computed as follows: Value of Land Received on Liquidation of Middlebelt Livonia
Land Company
80 acres (residential) $2,750 per acre X 80 acres X 1/2
$110,000.00
Distributed 1/53
120 acres
Distributed 7/53
100 (residential) $3,500 per acre X 100 acres X 1/2
175,000.00
20 (commercial) $21,750 per acre X 20 acres X 1/2
217,500.00
$502,500.00
Less: Cost
222,547.45
Long-term Capital Gain
$279,952.55
*302 The respondent determined that the purchase of the stock of Middlebelt Livonia Land Company by Alper and Green and the liquidation of the corporation were merely parts of a single transaction which had for its purpose the acquisition of the assets (principally land) of the corporation. The determination resulted in elimination of the long-term capital gain of $279,952.55 reported by Alper on the liquidation and a reduced basis of the assets by treating the cost of the stock as the basis of the assets received. This cost was stipulated to be $222,547.45 and the petitioners concede the correctness of this determination. There was no stipulation as to the division of this cost between the portion of the land designated as commercial and the portions designated as residential. In the return for 1953, Alper's allocation of the value of the land received on liquidation showed the following percentage division: Percent
80 Acres (residential)
$110,000.00
21.89
Distributed 1/53
120 Acres
Distributed 7/53
100 (residential)
175,000.00
34.83
20 (commercial)
217,500.00
43.28
Total
$502,500.00
100.00
The respondent allocated the cost of the *303 land in the following percentages: Commercial Property
40.84 percent
20 acres
Residential Property
59.16 percent
180 acres
The assessed valuation by the Wayne County, Michigan, Assessor's office on January 1, 1953, showed an allocation of value of approximately 60 percent to the residential property and 40 percent to the commercial property. Alper and Green developed 180 acres of the land into residential building sites and then divided the sites between themselves. They retained the remaining 20 acres for development of a shopping center. Alper sold some of the building sites he thus acquired to the various corporations and Mendota in 1953 and 1954. The respondent, utilizing the reduced basis of the land acquired on liquidation of Middlebelt Livonia Land Company, determined a gain of $18,258.21 in 1953 from the sale of building sites to the various corporations and Mendota, and a gain of $51,888.05 in 1954 from the same source. The total cost of $222,547.45 is allocable 75 percent to the residential sites and 25 percent to the 20 acres of commercial property. Facts Regarding Mendelson's Sale of Stock and Interest in Lots 700 and 701 In April *304 1954, the stock which Mendelson held in certain of the corporations was repurchased by those corporations. The parties stipulated the following schedule of repurchases from Mendelson of his stock interests, showing the dates on which payments were made for such stock: Dates of Payment
Name of
Corporation
Sales Price
Apr. 12, 1954
Dec. 17, 1954
Jan. 13, 1955
Emerson
$ 9,118.54
$ 451.70
$ 8,666.84
Fairwood
9,310.11
$ 9,310.11
Gwen
3,260.90
3,260.90
Ivory
6,289.98
6,289.98
Jewel
6,247.24
6,247.24
Marcy
2,618.92
2,618.92
Melvin
3,013.81
3,013.81
Mt. Vernon
6,308.86
6,308.86
Rickie
3,317.10
3,054.90
262.20
Shari
9,066.10
7,066.10
2,000.00
Sherbourne
9,362.17
7,362.17
2,000.00
Sunningdale
11,781.83
9,781.83
2,000.00
Terri
3,605.73
3,605.73
Woodsfield
10,360.28
10,360.28
Totals
$93,661.57
$24,661.80
$35,000.00
$33,999.77
On his Federal income tax return for the calendar year 1954, Mendelson reported the receipt of all of the purchase money, including the $33,999.77 actually received in 1955. Mendelson was on the cash basis for Federal income tax *305 purposes. The corporations did not issue any notes, checks or other evidence of indebtedness with regard to the $33,999.77. The money to pay the $33,999.77 was not available to pay Mendelson until the date it was actually paid. When Stout and Fargo were partially liquidated in January 1954, there was distributed to their stockholders an undivided one-half interest in lots 700 and 701 in the Cherry Hill Manor subdivision. The stockholders treated their interest as having a value of $18,390, the amount previously paid for the interest by the corporations. Mendelson had 18 percent of the stock in these corporations, and in January 1954 sold his interest in the lots to Alper for 18 percent of $18,390, or $3,310.20. The Federal income tax returns of Stone, Mendelson, Philip, and Robert for the calendar years 1951 and 1952 were filed on dates subsequent to March 15, 1952, and March 15, 1953, respectively. The gross income reported by each on those returns was as follows: Stone
Mendelson
Philip
Robert
1951
$15,636.59
$19,234.61
$11,398.29
$11,398.29
1952
18,284.00
24,073.58
16,599.15
16,599.15
A statutory notice of deficiency *306 was mailed to Stone, Mendelson, Philip, and Robert, respectively, on March 14, 1957. Opinion In the taxable years Alper, his wife and two sons, and Mendelson and Stone were engaged in the business of developing land and building and selling houses. They carried out this business through Mendota, a partnership in which they were members, and they organized a number of corporations, some of which are also petitioners in these proceedings. Each of the petitioner corporations reported as taxable income a part of the total income from the building operations and deducted as expenses a part of the total expenses. From 1950 to the middle of 1955 the partners, through their organization, built over 900 homes, and their sales approximated $11,800,000, with net profits of approximately $1,900,000. Some $400,000 of these profits was reported on the returns of the partnership. Profits of approximately $1,500,000 realized on the sale of 815 homes were reported on the corporate returns. Section 15(b), Internal Revenue Code of 1939, and section 11(c), Internal Revenue Code of 1954, provide for a surtax for each taxable year on the taxable income *307 of a corporation equal to 22 percent of the amount by which the taxable income exceeds $25,000. Section 431 of the Internal Revenue Code of 1939 allows a minimum credit of $25,000 in computing a corporation's income for each year which is subject to the excess profits tax. The principal issue concerns the tax treatment of the income reported on the returns of 24 of the corporate petitioners, that is, all the corporate petitioners except Sunningdale. The respondent made three determinations with reference to this income. These determinations are in the alternative. The respondent concedes that they are inconsistent with each other and that only one of them is ultimately to be held applicable. The determinations are (1) the disallowance of the surtax exemptions and in some cases the minimum excess profits credits claimed by the corporations on their returns; (2) the determination that the gross income reported by each of the corporations constituted income of the partnership, Mendota; and (3) the determination that such income constituted income of Sunningdale Homes, Inc. The petitioners contest all these determinations. The respondent treats as the primary determination the disallowance *308 of the surtax exemptions and minimum excess profits credits. This disallowance was pursuant to the authority of section 129(a), Internal Revenue Code of 1939, [2]section 269(a), [3] and in some cases section 1551, Internal Revenue Code of 1954. [4]
*309 The petitioners contend that these sections are not applicable in that, first, they refer only to corporations acquired and may not be regarded as including corporations newly organized, and second, that in the present case the corporations were not organized or acquired for the principal purpose of avoiding taxes by securing benefits which the acquiring persons would not otherwise enjoy. The provisions of section 129 have been held applicable in the cases of newly formed corporations, it being considered that control is acquired by organizing a corporation. Coastal Oil Storage Co. v. Commissioner, 242 F. 2d 396 (C.A. 4, 1957), modifying 25 T.C. 1304; James Realty Co. v. United States, 280 F. 2d 394 (C.A. 8, 1960). These cases are in accord with the administrative interpretation. See Regulations 118, sec. 39.129-1(d). The partners formed the corporations and by forming several rather than one they sought to secure the benefit of several surtax exemptions and minimum excess profits credits which they would not otherwise have enjoyed. The petitioners argue that Congress intended to authorize disallowance of benefits which could be claimed *310 only by the acquiring parties and which such parties would not otherwise enjoy and not benefits which could be claimed only by the acquired corporation. We have concluded otherwise. Thomas E. Snyder Sons Co., 34 T.C. 400 (1960), affd. 288 F. 2d 36 (C.A. 7, 1961), certiorari denied 368 U.S. 823 (1961). Furthermore, although the exemptions are claimed by the corporations, the stockholders are the persons seeking the benefit. See Commissioner v. British Motor Car Distributors, Ltd., 278 F. 2d 392, 394 (C.A. 9, 1960), reversing 31 T.C. 437 (1958). In the Revenue Act of 1950 a change was made in the corporation tax rates and tax base for 1950 and subsequent years. The prior system of graduated rates below $25,000, notch rates between $25,000 and $50,000, and uniform rates above $50,000 were replaced by a single rate applicable to normal tax net income and a surtax rate applicable to surtax net income in excess of $25,000. In the Senate Report on the bill, S. Rept. No. 2375, 81st Cong., 2d Sess., *311 1950-2 C.B. 483, 533-534, there appears the following comment: The normal tax rate is made applicable to the entire normal tax net income of all corporations; the surtax rate applies to the corporation surtax net income in excess of $25,000. Under this plan, the so-called notch provisions are eliminated. It is not intended, however, that the exemption of the first $25,000 of a corporation's surtax net income from the surtax shall be abused by the splitting up, directly or indirectly, of a business enterprise into two or more corporations or the forming of two or more corporations to carry on an integrated business enterprise. It is believed that sections 45 and 129 will prevent this form of tax avoidance. The petitioners contend that the principal purpose of the formation of the several corporations was not the avoidance of Federal taxes, but was to minimize the risks involved in the speculative home building industry. They state that the risks derive chiefly from the extreme dependence of the industry upon Government and from the length of time involved from the beginning of a subdivision until it is closed out. They say that at any point the home builder can be stopped *312 from the completion of the project by Government action over which he has no control; that the builder is dependent upon obtaining Federal Housing Administration and Veterans Administration insured mortgages; that the terms of these mortgages are political decisions made by Congress, the FHA and the VA; that the powers of these agencies to control the interest rate and the amount of down payment constitutes a hazard to the speculative home builder and that changes in the money market may have the effect of making it difficult to dispose of his mortgages. They argue further that in the Detroit area, where a large percentage of employment is in manufacturing, unemployment tends to fluctuate more than in other cities and that the home builder there runs the risk of having prospective purchasers withdraw from contracts, even where down payments have been made. They argue that the speculative home builder can limit the exposure to these risks by forming several corporations so that in a subdivision the homes to be built by one would, to the greatest extent possible, be sold first. The second corporation would build its houses and close title to them after the sale of the houses of the first *313 corporation and over the entire project the minimum number of corporations would be building at one time. These would, they argue, protect the builders against the risk that in the middle of the development one or more of the factors mentioned would have stopped them from building or selling the houses in the remainder of the project or subdivision. Alper, as an individual, acquired undeveloped land, platted and subdivided it, arranged for installation of sewers, water, and utilities, and developed it into building sites. The petitioners say that each of the several corporations bought improved lots from Alper, usually at his cost, and paid for the land or gave a note for the price, engaged contractors to build the houses, and paid them, ordered building materials from suppliers and paid for them, sold the houses through brokers and gave deeds to the purchasers, and that they maintained bank accounts and accounting books, made tax returns, and reported the income from the houses they built and sold. They contend that each corporation was actively in business and earned the income reported on its tax returns. While taxpayers may so arrange their business transactions as to minimize *314 their taxes, Gregory v. Helvering, 293 U.S. 465 (1935); United States v. Cumberland Public Service Co., 338 U.S. 451, the Supreme Court, in Higgins v. Smith, 308 U.S. 473 (1940), nevertheless said (p. 477): On the other hand, the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. It is command of income and its benefits which marks the real owner of property. In National Investors Corp. v. Hoey, 144 F. 2d 466, 468 (C.A. 2, 1944), the court stated that: to be a separate jural person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation: in other words, that the term "corporation" *315 will be interpreted to mean a corporation which does some "business" in the ordinary meaning; and that escaping taxation is not "business" in the ordinary meaning. In Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945), the Supreme Court stated: The incidence of taxation depends upon the substance of a transaction. * * * To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. The respondent points out that the partners held all the stock of each of the corporations involved, and contends that Alper, who actually controlled the operations, employed that control to keep the annual net income of each corporation to $25,000 or less. If additional income was in prospect, additional corporations were formed to make certain that no one of them had income in excess of $25,000. With a corporate surtax rate of 22 percent, the $1,500,000 in profits reported on the corporate returns would, if reported by a single corporation, be subject to surtax of some $300,000 or more, but by use of many corporations and restriction *316 of the profits of any of them to amounts below $25,000, the total corporate surtax and excess profits tax actually paid on these profits during the entire period was $364.21. In Coastal Oil Storage Co. v. Commissioner, supra, the Court of Appeals held that section 129 was applicable where a corporation acquired control of a subsidiary through stock ownership and sought to obtain through dividing its corporate business the benefit of an exemption and credit which it would not otherwise have enjoyed. The reason given for the creation of the subsidiary was to separate storage operations under Government contracts from operations under other contracts, but the court observed that no satisfactory reason was given why the same advantages could not have been obtained by separate bookkeeping that were obtained by separate incorporation, which necessarily resolved itself into little more than separate bookkeeping. The case of James Realty Co. v. United States, supra, is similar to the present case. Adolph Fine was the owner of certain undeveloped land in St. Louis Park, Minnesota, which he caused to be subdivided and platted for the purpose of home development. *317 He organized and had control of the taxpayer corporation and eight others in connection with this building development. The District Court found that the principal purpose for the acquisition of the taxpayer corporation by Fine was tax avoidance by securing the benefit of another corporate exemption and excess profits credit which he would not otherwise enjoy, and concluded that the Commissioner properly disallowed a surtax exemption and minimum excess profits tax credit under sections 15(c) and 129(a)(1) of the Internal Revenue Code of 1939. In affirming this decision the Court of Appeals stated (p. 397): The determination by the District Court that Mr. Fine organized and acquired control of the taxpayer corporation for the principal purpose of tax avoidance was a finding of fact which is conclusive on this appeal if supported by substantial evidence and not clearly erroneous. Although Mr. Fine testified that in forming the taxpayer and eight other corporations he had in mind the two purposes of implementing his estate plan and of spreading and minimizing risks of loss from business reversal or tort liability and that tax saving was not the principal purpose, he admitted that he *318 was aware of the tax consequences of the multiple corporate set up and testimony of his secretary and bookkeeper was to the effect that "she made adjusting entries" in the books of Adolph Fine, Inc., Fine Realty, Inc., and the development companies including taxpayer; that "a great deal of consideration was given to taxes" by Mr. Fine and his accountants and that "we were very careful to keep the figures under $25,000.00, the profit figures." An office memorandum from Mr. Fine made in 1957 concerning "the land status" of "the following companies" "to determine what company should own and develop" certain lands included the statement: "This will depend upon the possible profit status for the year 1957 in each of the companies." The tax returns of the various corporations formed by Mr. Fine as shown in the Exhibit B which the District Court included in its opinion shows that in 1950 the income from development and sale of homes reported by Adolph Fine, Inc. and Fine Realty, Inc. was $202,268.00 and $34,212.00. For the ensuing years 1951-1956 following the creation of the various development companies the taxable income of the two named companies dropped with but few exceptions to less *319 than $25,000.00 and each of those companies reported less than $25,000.00 Notwithstanding Mr. Fine's testimony that avoidance of tax was not a prime consideration in splitting his home building business, there was substantial evidence to support the finding of the Court that the principal purpose was to avoid federal income or excess profit tax by securing the benefit of deductions and credits which he would not otherwise enjoy. The corporations here involved had no employees other than their officers. Alper and Stone, and for a time Mendelson, were the persons who carried out these projects, whether on their own account, or as representing Mendota or the corporations which they controlled. Alper acquired the land, developed it into building sites, and arranged for water and utilities. Mendota, the partnership in which Alper and his wife had the largest interest, usually, or at least frequently, obtained the building permits and the FHA or VA loan commitments for the homes to be built in a subdivision. Alper decided which corporations would be allotted sites in a subdivision and how many lots each would have. Supervision of construction was by members or employees of Mendota. Members *320 or employees of Mendota ordered materials. The contractors who did the building performed their work on all the homes in a subdivision regardless of which corporations were involved, and their contract price was negotiated on that basis by Mendota and not by separate agreement with each corporation. The accounting was handled by Stone, who allocated the construction costs to the corporations selected to report the sales. Bank accounts were opened for each corporation, and Alper could issue checks of that corporation in payment of the costs of construction or materials. Alper furnished the money in the form of loans to each corporation to cover these costs. When the homes were sold, the proceeds were used to repay Alper for advances, and Alper borrowed the rest in the form of loans and advanced this money to other corporations for building. Usually the buyers of the homes had no knowledge at the time of the sale of the existence of the corporation which ultimately deeded the property to them. In many instances Alper continued to hold title until it became necessary to convey title to the individual purchasers, and then transferred title to the respective corporations selected to report *321 the sales so that the designated corporation could, in form, execute deeds to the purchasers. The profit reported in the returns of each corporation was directly controlled by the allocation of building sites to the corporation. The number of corporations to be assigned lots in a subdivision was based upon the estimated profits of the entire operation. The all-important figure to Alper and his associates was $25,000. So long as the net income of each corporation in any one year was kept below $25,000 the surtax and excess profits tax was to be avoided. Alper distributed the sites among the number of corporations required to keep the income reported on the returns of each corporation below $25,000, and if there were not enough existing corporations to which the sites could be transferred so that each corporation had net income of less than $25,000, additional corporations were created and their capital stock acquired and the lots assigned accordingly. As an example of this technique, we note that in one subdivision, Holtzman-Silverman No. 5, there were 82 building sites which were originally allotted among six corporations, 13 or 14 sites to each. After some construction costs *322 were paid from the bank accounts of these six in 1954, three new corporations were organized and the 82 sites redistributed among the nine corporations, each receiving from 8 to 11 sites. The construction costs previously paid were also reallocated among the nine corporations. The sales of the 82 houses resulted in profits of nearly $200,000, reported by nine corporations, with no corporation reporting an amount in excess of $25,000. Had the sites not been reallocated, some of the original six would have had profits to surtax. As soon as the profits reportable by one of the corporations reached the $25,000 limit of the surtax exemption and minimum excess profits credit, that corporation became inactive for the remainder of its taxable period, and it was used again only if another surtax exemption or minimum excess profits credit was required in a following taxable period. So carefully was this controlled that in only three instances was one of the petitioner corporations permitted to report more than the $25,000 amount and in those instances the amount reported did not exceed $25,500. In some cases where, in spite of Alper's calculations, a corporation would have been required to *323 report more than $25,000 income, officers' salaries or wages were paid from those corporations' accounts in amounts sufficient to reduce their net income below the figure of $25,000. Also, in some cases when the $25,000 profit figure was reached the first fiscal year of the corporation was cut short as a means of avoiding the accumulation of more taxable income. The petitioners contend that terminating the first fiscal year of a corporation at the end of a few months is a privilege available to any corporate taxpayer even if it serves to reduce its tax liability. Assuming, without deciding, this to be true, the fact that this device was used by the partners in conjunction with other methods of limiting the accumulation of taxable income may be considered as tending to show the principal purpose of the partners in their use of a number of corporations. The petitioners' argument that the use of several corporations in a subdivision would serve to minimize the risks of the speculative home building business is not persuasive. The argument supposes that if the first corporation had sold all its houses in a subdivision and economic changes or other hazards occurred before the next corporation *324 had sold all its houses, and before the third corporation had built any, the project could be abandoned and the second corporation take a loss, the third corporation could avoid any further expense and the first corporation would have realized all its profits which would thus be preserved. A corporation generally does not have purposes apart from its stockholders. This is particularly so in the case of a closely held corporation. So far as the individual petitioners are concerned it would make no difference to them, in the circumstances supposed, whether the subdivision was being built by one corporation or three. The stockholders would be no better off on the whole, the gain on the first group of houses would be offset against the losses on the others. The preservation of the profits of the first corporation would not benefit the stockholders. The petitioners have not shown that the reasons stated for the formation of several corporations would have the effect contended for of minimizing the risk to the stockholders. The reasons given by the petitioners as prompting the formation of many corporations are not convincing. *325 Similar reasons were advanced in Aldon Homes, Inc., 33 T.C. 582, appeal dismissed (C.A. 6, 1960), where the taxpayer, a builder of dwelling houses, organized a number of subsidiary corporations and conveyed 14 or 15 lots to each. We there concluded that the several corporations were organized for no purpose other than the obtaining of tax benefits and that they did not in fact carry on the activities which resulted in the profits of the venture. As in that case, the present case involves a unitary business artificially divided into separate corporations for tax purposes with only ostensible business reasons offered. See also Shaw Construction Co., 35 T.C. 1102 (1961). The petitioners argue that if the Court should find that section 129 is applicable and that all of the corporations were not formed for valid business reasons, it is clear that certain of them were not formed principally for tax avoidance purposes. They contend that they would, as a minimum, have formed one corporation for each separate subdivision or project, and suggest that the Court should regard the first corporations formed in each year as formed for the building of the projects undertaken *326 in that year - for example, the first two formed in 1951 for the two projects started in 1951 and the first two formed in 1952 for the two projects started in that year. These corporations, they argue, would have been formed in any event for these purposes and not for tax avoidance purposes. The respondent did not disallow the surtax exemptions and excess profits tax credits claimed by three of the corporations - Sunningdale, Stout, and Fargo. These three were available and sufficient in number to undertake separately the projects commenced in 1951 and 1952. Some six or seven projects were started in 1953 and three in 1954. Stout and Fargo were inactive during most of 1953 and Sunningdale was inactive from the end of J1ne 1953, when its net income had almost reached $25,000. It was not essential that several new corporations be formed when these were available. In 1954 Stout and Fargo would have been available had they not been dissolved in May. Sunningdale was available but was kept inactive from May to December. If the partners had in fact formed one corporation for each subdivision or project the respondent might not have raised the issue, as each such corporation would have *327 incurred liability for some amount of surtax. Under the facts as they exist we are not called upon to decide the point. It is not the function of the Court to remake the arrangements for the taxpayers and to allow the exemptions to the extent they might have been allowable under different facts. The petitioners further contend that there were specific reasons for the formation of certain of the corporations. They say that Shari and Woodsfield were formed to acquire land and build apartments for rental, and their corporate articles authorized them to do this. The facts show these corporations were not so used and instead were used as any of the others. The petitioners say that Mt. Vernon and Emerson were formed in May 1951 to enable Alper and his associates to secure additional priorities in case of stoppage of construction due to the Korean War, since they had learned that permits might be required for certain types of building. It has not been shown that the formation of these corporations enabled the builders to avoid restrictions. Emerson was used in September 1951, but Mt. Vernon was not used for more than a year after it was organized. The petitioners say that Sherbourne and *328 Fairwood were formed to stimulate the efforts of Robert and Philip in the business and that this was to be done by giving Robert an 18 percent interest in Fairwood and Philip an 18 percent interest in Sherbourne, instead of each having a 9 percent interest in each corporation as in those formed before and after. Each of these stockholders was to act as superintendent of construction for the corporation in which he held this particular interest. The net income of these two corporations was not greatly different. These men shared equally in the overall profits of all the corporations and there is no indication that the alleged purpose was accomplished. Also, we note that in the fiscal year ended in 1954 Fairwood paid a salary of $1,500 to Philip, who was not a stockholder or officer and supposedly did not perform services for it. Sherbourne did not pay any salaries. The discrepancy is not explained. Various reasons are suggested for the formation of certain others. We have considered the argument but we find no merit in the contention that the corporations were formed principally for the purposes advanced by the petitioners. Stone admitted that the petitioners made use of the corporations *329 to produce the least tax, but said that they were not formed for that purpose. The record leaves no doubt that the principal purpose of the partners in organizing and acquiring control of the 24 corporations was to avoid income and excess profits tax. The respondent did not err in disallowing the surtax exemptions and minimum excess profits tax credits claimed by the 24 corporations. It becomes unnecessary to decide whether the income of these corporations is taxable to Mendota or to Sunningdale under one of the alternative determinations of the respondent, or to consider the application of section 1551 of the 1954 Code in the cases of Barton, Bostwick, and Newport. Valuation of Lots 700 and 701 In January 1954 Stout and Fargo were liquidated and their assets distributed to their stockholders, the partners in Mendota. These assets included an undivided one-half interest in some 14 acres of land in the Cherry Hill area designated lots 700 and 701. The partners valued the interests they received at $18,390, the amount paid by the corporations for that one-half interest in June 1953. The respondent determined that the total value of the undivided one-half interests distributed *330 to the stockholders in January 1954 was $132,500. This figure was contained in an option to purchase given by Alper to Schostack on April 4, 1954, but which was never exercised. The petitioners presented an expert witness who testified that in his opinion the value of an undivided one-half interest in lots 700 and 701 on January 12, 1954, was $40,500. The amount of $132,500 was the price Schostack was willing to pay if he could obtain leases from suitable tenants for space in the proposed shopping center, and adequate financing. He did not obtain such leases or financing, after two attempts, and did not purchase the property. The expert witness based his opinion of the value upon a later appraisal of the property and a review of the negotiations for leases and financing. He testified that he was able to ascertain the price paid for land in 12 of the 19 shopping centers in the Detroit area and that the price usually varied from $1,900 per acre to slightly over $5,000 per acre, and in two instances, which he described as exceptional, shopping center property sold for $15,000 and $20,000 per acre, respectively. He testified that 11.7 acres were contained in lots 700 and 701 and that *331 he considered $7,000 per acre as the approximate fair market value of this acreage. He stated that $81,000 was the fair market value of lots 700 and 701 and the value of an undivided one-half interest was $40,500. Alper actually paid $105,000 for the other undivided one-half interests in lots 700 and 701 on December 15, 1954, but this was 11 months after the liquidation of Stout and Fargo and the evidence indicates that at the time Alper paid this price he had obtained leases with seven occupants of the proposed shopping center and had firm commitments as to financing. The petitioners' expert witness testified that he took these factors into consideration. We are convinced that an undivided one-half interest in lots 700 and 701 on January 12, 1954, had a fair market value of $40,500, and we have so found. Valuation of Cherry Hill Manor Option and Lots Alper acquired an option on 160 acres of land in 1949 to buy at $1,050 per acre. His share was an undivided one-half interest. He transferred his interest in this to Cherry Hill Manor, Inc., a corporation wholly owned by him. In January 1951 he dissolved this corporation and reacquired his interest in the option. The issue *332 concerns the fair market value of this half interest in approximately 78 acres of this land in January 1951. Alper regarded the fair value of the subject acreage as $2,500 per acre and reported the gain on liquidation as $1,450 per acre, the difference between this fair value and the option price. The respondent determined the fair value to be $1,100 per acre and reduced the value of the option to $50 per acre. The petitioners presented an expert witness who testified that, in his opinion, the fair market value of the 78 acres on January 31, 1951, was $1,900 per acre. The respondent introduced evidence that acreage adjoining the 78 acres was sold in January 1951 for a price of approximately $1,100 per acre. The petitioners' evidence indicates that the 78 acres had a considerably greater frontage on a paved road, easier accessibility to established water mains, and a considerably higher elevation in relation to existing storm drainage facilities than the land which sold for $1,100 per acre. The evidence further indicates that subsequent to the purchase of this adjacent acreage in 1951 the developer of the adjacent land experienced difficulty in storm water drainage and was ultimately *333 required to install a special relief sewer and lift pump in order adequately to dispose of storm water. We have found from the evidence that on January 31, 1951, the acreage had a fair market value of $1,900 per acre. Since the purchase price under the option was $1,050 per acre, the fair market value of the option on January 31, 1951, was $850 per acre. This finding may be applied in a recomputation under Rule 50. After Alper received the one-half interest in the option to purchase the Cherry Hill Manor land he purchased 78 acres for $1,050 per acre and received, as his share of that land, 217 lots. These lots, through the years 1951, 1952, and 1953, were conveyed by Alper to Mendota and the various corporations. Alper reported his basis in these lots as $2,500 per acre - $1,450 for the option and $1,050 as the cost to purchase. Alper sold the lots to Mendota and the various corporations on the basis of $2,500 per acre. The respondent determined that in 1951, 1952, and 1953 the gain realized by Alper upon the sale of lots into which the 78 acres purchased under the option received on the liquidation of Cherry Hill Manor, Inc., in 1951 was subdivided was understated. We have held *334 that the fair market value of the 78 acres, when the option to purchase was received by Alper on January 31, 1951, was $1,900 per acre, not $2,500 as reported by Alper, nor $1,100 as determined by the respondent. It follows that the gain reported by Alper on the sale of the lots in 1951, 1952, and 1953 was understated. The gain from the sale of the lots, however, was less than as the respondent determined. The amount of such gain will be computed under Rule 50. Basis of Middlebelt Livonia Land In August 1952 Alper and another builder jointly acquired an option to purchase the stock of a corporation which owned nearly 200 acres of land. They exercised the option and changed the name of the corporation to Middlebelt Livonia Land Company. In January 1953 Alper received in partial liquidation an undivided half interest in about 80 acres and in July 1953 he received an undivided half interest in the remaining 120 acres. Alper valued his interest in this land at $502,500, regarding the 80 acres distributed in January as residential land worth $2,750 per acre, 100 acres of the land distributed in July as residential land worth $3,500 per acre, and 20 acres as land for commercial use, *335 valued at $21,750 per acre. The cost to Alper was $222,547.45. On his 1953 return Alper reported long-term capital gain of $279,952.55 from this transaction. The respondent eliminated this gain, and the petitioners concede that such elimination was correct. The issue concerns the basis to be allocated as between the commercial land, 20 acres, and that described as residential, 177.74 acres. In his return for 1953 Alper valued the commercial property at $435,000 and the residential at $570,000, a ratio of about 43.3 percent to 56.7 percent. The respondent treated all the residential property as worth $3,500 per acre and allocated the actual cost at the ratio of 40.84 percent to commercial and 59.16 to the residential land. This was said to approximate the ratio of assessed values for local taxes. The petitioners' expert witness expressed the opinion that the fair market value of the residential land was about $2,000 per acre and that of the land usable for commercial purposes about $6,000 per acre. On this basis he would allocate the actual cost of the half interest acquired by Alper at the ratio of approximately 25 percent to the commercial and 75 percent to the residential property. *336 This is the only competent evidence available as to the valuations at the time this property was acquired, and we find that the cost should be allocated on that basis. This finding can be given effect in a recomputation under Rule 50. Income reported by Mendelson for 1954 In the case of Morrie and Rae R. Mendelson, the petitioners claim an overpayment of tax for 1954. Mendelson withdrew from the partnership at the end of 1953 and agreements were reached under which the corporations in which he held stock were to repurchase his shares. He reported on his 1954 return the entire gain realized upon this arrangement. Actually, a part of it, $33,999.77, was not paid to him until January 13, 1955. The respondent argues that there is nothing in the record to show that Mendelson did not constructively receive this contested amount. He received no check, note, or other evidence of indebtedness during 1954 for this amount. There is testimony that the corporations obligated to pay did not have the money available in 1954. In these circumstances there was no constructive receipt by Mendelson, a cash basis taxpayer, during 1954. The amount in issue was income in 1955. This claim of these petitioners *337 is sustained. These petitioners also contest in their petition an adjustment by the respondent increasing the gain realized by Mendelson upon the liquidation of Stout and Fargo in 1954, and contend that Mendelson realized in 1954 a short-term loss upon the sale of property received on the liquidation. Stout and Fargo, on January 12, 1954, distributed to stockholders in partial liquidation an undivided one-half interest in lots 700 and 701 in the Cherry Hill Manor subdivision. Mendelson was a stockholder and received an interest in the lots proportionate to his holdings in the two corporations, which was 18 percent. Stout and Fargo had paid a total of $18,390 for the undivided one-half interest. Upon the distribution by the corporations the stockholders treated the one-half interests as having a value of $18,390, the same as the cost to the corporations. Mendelson sold his 18 percent interest in the undivided one-half interests in the two lots to Alper on January 12, 1954, for $3,310.20, being 18 percent of $18,390. We have found that an undivided one-half interest in lots 700 and 701 had a fair market value on January 12, 1954, of $40,500. Mendelson contends that if the fair market *338 value of the undivided one-half interests in the lots was greater than $18,390 he is entitled to a short-term loss represented by the difference between 18 percent of the value at which he reported the transaction and 18 percent of the greater amount. The respondent determined that Mendelson realized additional capital gains on the distribution of the undivided one-half interests in the two lots but has not argued on brief as to the loss resulting from the sale of Mendelson's share of the undivided one-half interests to Alper. Respondent apparently does not question petitioner's argument on this issue. Since Mendelson's basis in the 18 percent interest in the undivided one-half interests in the two lots would be the fair market value of that interest which he received, it follows that when he sold it at a price less than the basis he sustained a short-term loss. Consideration will be given to such loss in the Rule 50 computation. Statute of Limitations In the cases of the individual petitioners other than Henry S. Alper and Agnes V. Alper, the issue is raised as to whether the assessment of any deficiency for the calendar years 1951 and 1952 is barred by the statute of limitations. *339 The respondent relies upon section 275(c) of the Internal Revenue Code of 1939, which provides: If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed * * * at any time within five years after the return was filed. The burden of proof is on the respondent with respect to this issue. The returns of the petitioners involved in this issue were filed on a date later than March 15, 1952 (for the taxable year 1951), and March 15, 1953 (for the taxable year 1952). A statutory notice of deficiency was mailed to each of the petitioners involved in this issue on March 14, 1957, less than five years after the filing of the returns. The question therefore is whether the petitioners or any of them in their returns for 1951 or 1952 omitted from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the returns. The respondent relies upon the alternative determination that the income reported by the 24 corporations is taxable to the partners in Mendota as partnership income. *340 Since we have sustained the respondent's determination that section 129 is applicable, this income is not attributable to Mendota or the partners therein, and it follows that these petitioners did not omit such an amount as to make section 275(c) applicable. The statute of limitations bars the assessment of deficiencies for 1951 and 1952 as to these taxpayers. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Robert L. Alper and Lenore S. Alper, Docket No. 67874; Philip J. Alper and Eleanor B. Alper, Docket No. 67875; Joshua J. Stone and Eunice S. Stone, Docket No. 67876; Morrie Mendelson and Rae R. Mendelson, Docket No. 67877; Barton Building Company, Docket No. 67878; Bedford Building Company, Docket No. 67879; Bostwick Building Company, Docket No. 67880; Dover Building Company, Docket No. 67881; Fremont Building Company, Docket No. 67882; Emerson Homes, Inc., Docket No. 67883; Fairwood Building Company, Docket No. 67884; Gwen Building Company, Docket No. 67885., Jewel Homes, Inc., Docket No. 67886; Jasper Building Company, Docket No. 67887; Ivory Homes, Inc., Docket No. 67888; Marcy Building Company, Docket No. 67889; Melvin Building Company, Docket No. 67890; Mt. Vernon Homes, Inc., Docket No. 67891; Newport Building Company, Docket No. 67892; Oporto Building Company, Docket No. 67893; Radford Building Company, Docket No. 67894; Richland Building Company, Docket No. 67895; Rickie Building Company, Docket No. 67896; Shari Building Company, Docket No. 67897; Sherbourne Building Company, Docket No. 67898; Sutton Building Company, Docket No. 67899; Terri Building Company, Docket No. 67900; Woodsfield Building Company, Docket No. 67901; Sunningdale Homes, Inc., Docket No. 67902.↩
2. SEC. 129. ACQUISITIONS MADE TO EVADE OR AVOID INCOME OR EXCESS PROFITS TAX. (a) Disallowance of Deduction, Credit, or Allowance. - If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately prior to such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For the purposes of clauses (1) and (2), control means the ownership of stock possessing at least 50 per centum of the total combined voting power of all classes of stock entitled to vote or at least 50 per centum of the total value of shares of all classes of stock of the corporation. ↩
3. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. ↩
4. SEC. 1551. DISALLOWANCE OF SURTAX EXEMPTION AND ACCUMULATED EARNINGS CREDIT. If any corporation transfers, on or after January 1, 1951, all or part of its property (other than money) to another corporation which was created for the purpose of acquiring such property or which was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor corporation or its stockholders, or both, are in control of such transferee corporation during any part of the taxable year of such transferee corporation, then such transferee corporation shall not for such taxable year (except as may be otherwise determined under section 269(b)) be allowed either the $25,000 exemption from surtax provided in section 11(c) or the $100,000 accumulated earnings credit provided in paragraph (2) or (3) of section 535(c), unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer. For purposes of this section, control means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of the corporation. In determining the ownership of stock for the purpose of this section, the ownership of stock shall be determined in accordance with the provisions of section 544, except that constructive ownership under section 544(a)(2) shall be determined only with respect to the individual's spouse and minor children. The provisions of section 269(b)↩, and the authority of the Secretary under such section, shall, to the extent not inconsistent with the provisions of this section, be applicable to this section.